UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| ANGELA S.C., | ) | No. 19 CV 50045 |
| | ) | |
| Plaintiff, | ) | Magistrate Judge Iain D. Johnston |
| | ) | |
| v. | ) | |
| | ) | |
| ANDREW SAUL, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Angela S.C.[1] brings this action under 42 U.S.C. § 405(g) seeking remand of the decision denying her social security benefits. For the reasons below, Plaintiff's motion for summary judgment is granted, the Commissioner's motion for summary judgment is denied, and the case is remanded for proceedings consistent with this opinion.

**I. BACKGROUND**

Plaintiff filed an application for disability benefits on October 15, 2015[2] alleging disability caused by fibromyalgia, neuropathy in her upper and lower extremities, post-surgery right shoulder issues, osteoarthritis, rheumatoid arthritis, depression, Attention Deficit Hyperactivity Disorder, anxiety/stress panic disorder, bone on bone C4-5 vertebrae, and bone spurs in her lower spine. R. 14, 228, 250. She alleged an August 18, 2015 onset date and that she stopped working because of her impairments on July 1, 2013. R. 14-16, 251. Plaintiff's claim was denied initially and upon reconsideration, so she requested a hearing before an Administrative Law Judge. R. 14.

---

[1] Plaintiff's last name has been redacted in accordance with Internal Operating Procedure 22.
[2] Plaintiff previously filed a disability application on June 25, 2013 that was denied on August 17, 2015. R. 149-61. That application is not the subject of this appeal.

Plaintiff appeared with counsel[3] at a hearing before an ALJ on September 12, 2017. She was then forty-six years old. R. 14, 296. At the hearing, Plaintiff testified about her medical history, impairments, subjective symptoms, and daily activities. According to her testimony, Plaintiff has pain in her hips, hands, lower lumbar region, and joints, numbness in her right arm and continuous pain in the left. R. 58-59. She discussed her neck fusion surgeries that she says have not significantly benefitted her, predicted she would need more surgeries to address these issues, and said that all these medical issues at her age was "very depressing." R. 60, 68. She testified that her pain and medications meant to treat the pain cause weakness and fatigue, she "can't lift a gallon of milk," can walk only about a block before needing to stop, can sit or stand for a maximum of 30 minutes at a time, and has difficulty climbing stairs. R. 59-60. Her husband does all the shopping and yard work. She has difficulty bending, stooping, crawling, kneeling, reaching forward or overhead, and using her hands. Her pain and various medication side effects keep her awake at night though she can handle her personal care like showering and dressing. She is unable to do laundry, vacuum, dust, mop, or take out the garbage. R. 60-61. She drives her seventeen-year-old son who has Asperger's syndrome five minutes each way to and from school and therapy appointments; however, she does not like to drive and uses a rearview camera so she does not have to twist her neck to look behind her because it is painful. R. 61-63, 67. She can use an iPad to check her email about once every three days, but she doesn't read books, text, or hold a cell phone anymore because of her hand pain and numbness. R. 63-64. When she uses her house phone, she uses speakerphone because her hands go numb holding the phone. R. 64

After the September 12, 2017 hearing, the ALJ followed the five-step evaluation process set forth by the Social Security Administration in 20 C.F.R. § 404.1520(a)(4) and found that

---

[3] Plaintiff is represented by a different attorney on this appeal. *See* R. 14.

2

Plaintiff was not disabled. The ALJ specifically found the following: (1) at Step One, that Plaintiff had not engaged in substantial gainful activity starting from her August 18, 2015 alleged onset date, R. 16; (2) at Step Two, that Plaintiff had "the following severe impairments: spinal disorder; osteoarthritis of the hands; bilateral carpal tunnel syndrome and left ulnar disorder; fibromyalgia/rheumatoid arthritis; chronic obstructive pulmonary disease (COPD); headaches; depression; attention deficit-hyperactivity disorder (ADHD); cognitive disorder; anxiety; [and] post-traumatic stress disorder (PTSD)," *id.*; at Step Three, that Plaintiff did not have an impairment or combination of impairments that met or equaled any listed impairment, R. 17-21; that Plaintiff had the residual functional capacity to perform sedentary work[4]

> except never climb ladders, ropes, or scaffolding and no more than occasionally climb ramps and stairs, balance, stoop, crouch, kneel, crawl, bend, or twist; she should be provided a sit and stand option that allows the claimant to stand 1 to 2 minutes after sitting 30 minutes; no more than frequent lifting or reaching in all directions and use the hands no more than frequently for handling, fingering, and feeling bilaterally; avoid concentrated exposure to lung irritants and noise at traffic level or louder; limited to understanding, remembering, and carrying out no more than simple routine tasks performing the same tasks day in and day out with no public contact and no more than occasional contact with coworkers and supervisors; no work requiring teamwork situations (cannot engage in work where the claimant needs to work with others to complete same job task(s)), but she can work independently; and no strict quotas (no work where someone is checking up on the claimant during the workday to make sure she is on pace with a set quota, goal, or with other employees), but she is able to do work where performance is measured by what is completed by the end of the workday,

R. 21; (5) at Step Four, Plaintiff could not perform any of her past relevant work, R. 26; and at Step Five, Plaintiff had the residual functional capacity to perform the jobs of eye glass assembler (DOT 713.684-038), circuit board tester (DOT 726.684-110), and costume jewelry maker (DOT 735.687-034).

---

[4] Sedentary work is defined as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools," with some walking and standing, and good use of the hands for repetitive finger actions. Most work at the sedentary level is done at the sitting position entailing almost no stooping. SSR 83-10, 1983 SSR LEXIS 30, at *12-13.

3

## II. STARNDARD OF REVIEW

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the Commissioner [], with or without remanding the cause for rehearing." 42 U.S.C. § 405(g). The Commissioner's denial of disability is conclusive when supported by substantial evidence. *Id.*; *Skinner v. Astrue*, 487 F.3d 836, 841 (7th Cir. 2007). Substantial evidence "means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). The Court may not displace the ALJ's judgment by reconsidering facts and evidence, reweighing evidence, or by making independent credibility determinations. *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008); *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Similarly, even if reasonable minds could differ on whether a claimant is disabled, a reviewing court must affirm the ALJ's decision if it is adequately supported. *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009).

However, review of an ALJ's decision is not a rubber stamp of approval. *Biestek*, 139 S. Ct. at 1154 ("mere scintilla" not substantial evidence). The court must critically review the ALJ's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). The ALJ's conclusion will not be affirmed where he fails to build a logical bridge between the evidence and his conclusion, even if evidence exists in the record to support that conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002) (where opinion is "so poorly articulated as to prevent meaningful review" the case must be remanded). Additionally, courts may not build a logical bridge for the ALJ. *Mason v. Colvin*, 13 CV 2993, 2014 U.S. Dist. LEXIS 152938, at *19-20 (N.D. Ill. Oct. 29, 2014).

### III. ANALYSIS

Plaintiff primarily argues the ALJ erred by improperly discounting the opinion from her treating rheumatologist, Dr. Alghafeer. Relatedly, Plaintiff claims the ALJ should have solicited another expert to review approximately 250 pages of post-May 2016 medical records (see R. 715-980) that were submitted after the two state agency consultants made their opinions before rendering his decision. The Court agrees that the ALJ erred when weighing Dr. Alghafeer's opinion and by not submitting the post-May 2016 evidence to a medical expert for review. Because these issues are related, the Court addresses them together.

Plaintiff's argument mainly focusses on the post-May 2016 evidence and the ALJ discussed much of the pre-May 2016 medical evidence in the record, so the Court will not discuss that evidence at length. *See* R. 16-22. To summarize, Plaintiff has a history of multiple cervical spine surgeries to treat her right shoulder pain. She also has a history low back pain and pain management alongside complaints of severe pain and hand numbness. However, she mostly displayed relatively normal range of motion and a few instances of tenderness throughout the pre-May 2016 treatment notes albeit with some exceptions.

At the request of the Commissioner, Plaintiff underwent a consultative examination with Dr. Muhammed Rafiq on January 30, 2016. R. 561-65. According to his examination report, Plaintiff complained of a "psych" disorder, neck pain, and rheumatoid arthritis. Upon examination, Plaintiff was in no distress. She could get on and off the exam table and walk more than fifty feet without support. She did not use assistive devices. She could not hop on her right leg but could stand on her left with mild difficulty. R. 563-64. She had normal grip strength and could manipulate objects, extend her hands, make fists, squeeze, oppose fingers to thumbs, pick up a coin, and flip pages bilaterally without difficulty. She had reduced range of motion in her

shoulders (abduction and flexion limited to 110 degrees). She had positive trigger point tenderness bilaterally in her upper shoulders. *Id*. She had reduced range of motion in the cervical spine equal to 5 degrees flexion and extension, 10 degrees bilateral rotation and 5 degrees lateral flexion. Her straight leg test was negative. Plaintiff also demonstrated reduced range of motion in the lumbar spine equal to 45 degrees of flexion with neck pain. R. 563. Her mental examination was normal. Dr. Rafiq's impression was that Plaintiff suffered from depression, ADHD, PTSD, neck pain status post-surgery, rheumatoid arthritis, fibromyalgia, osteoarthritis, and low back pain. R. 565.

State medical examiners Dr. Charles Kenney and Dr. James Hinchen each rendered a medical opinion. R. 117-20, 137-40. Dr. Kenney opined in his February 2016 report that Plaintiff was limited to "light" work,[5] could occasionally lift and carry twenty pounds, frequently lift and carry ten pounds, stand, walk, or sit six hours in an eight-hour workday, and could otherwise push and pull without restriction. R. 117-18. He further opined Plaintiff could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. Plaintiff was limited in front and overhead reaching bilaterally, but otherwise had no manipulative limitations. R. 119.

On reconsideration, Dr. Hinchen's May 10, 2016 opinion was similar to Dr. Kenney's. Dr. Hinchen also opined that Plaintiff should be limited to "light" work, but could occasionally lift and carry twenty pounds, frequently lift and carry ten pounds, stand, walk, or sit six hours in an eight-hour workday, and could otherwise push and pull without restriction. R. 138. Similarly to Dr. Kenney, Dr. Hinchen opined that Plaintiff could occasionally climb ramps, stairs, ladders, ropes, scaffolds, and could occasionally kneel, crouch, and crawl, and was limited in front and

---

[5] Light work is defined as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds," with a "good deal" of walking and standing and "some" pushing and pulling. SSR 83-10, 1983 SSR LEXIS 30, at *13-14.

6

overhead reaching. R. 138-39. However, unlike Dr. Kenney, Dr. Hinchen opined Plaintiff could frequently balance and stoop and that her fingering was limited bilaterally. *Id*. The ALJ gave both Dr. Hinchen's and Dr. Kenney's opinion "some weight." R. 25.

Another opinion comes from Plaintiff's treating physician's assistant, Christa Cooper. R. 715-20. On January 26, 2017, Ms. Cooper opined Plaintiff experienced pain symptoms that affect her ability to concentrate and maintain attention "frequently" (or between 50% and 75% of the time) and her symptoms would preclude Plaintiff from maintaining a full or part time job (though she was "capable" of low stress jobs). R. 715-17. She opined that Plaintiff's symptoms slightly affected her ability to perform daily activities, she would need to lie down intermittently and take two to three scheduled breaks ranging from five to thirty minutes each day, and would be absent from work four or more times per month due to her symptoms. R. 717-18. She opined Plaintiff could frequently lift under ten pounds, occasionally lift over ten pounds, but never lift more than twenty pounds. R. 718. Ms. Cooper wasn't sure how many blocks Plaintiff could walk without rest or pain, but opined she could sit for thirty to forty minutes and stand for between fifteen and thirty minutes at a time, could not perform repetitive activities with her arms and hands, but had good use of her fingers for dexterity and working with small objects repetitively. R. 719-20. In an eight-hour workday, Plaintiff could sit and stand/walk for about two hours at a time respectively. R. 720. However, Ms. Cooper gave these opinions with one caveat: she had only been Plaintiff's provider for approximately one month, her opinion was based only on the records she had received, and her opinion might change with ongoing treatment. *Id*. The ALJ gave Ms. Cooper's opinion "minimal weight." R. 26. There are no other opinions on record from Ms. Cooper.

7

Finally, Plaintiff's treating rheumatologist Dr. Ibrahim Alghafeer opined in his February 2017 medical source statement that, based on Plaintiff's medical condition and his treatment history with her dating back to May 2015, Plaintiff experienced constant (between 75% and 100% of the day) severe symptoms and medication side effects, would be incapable of even low stress jobs, her symptoms would make it impossible to maintain persistence and pace for employment purposes, it was medically reasonable that Plaintiff would need to lie down or elevate her feet throughout the day to reduce her symptoms, and that she would likely miss four days of work per month because of her symptoms. R. 346-48, 350. He further opined that she could occasionally lift and carry under ten pounds of weight and never carry more than ten pounds, could walk one city block without experiencing severe pain, could sit and stand for approximately thirty minutes at a time and would need to change positions every thirty minutes. R.349. Additionally, she could not perform repetitive tasks with her hands or fingers, had significant limitations in her ability to work with small objects, though she did have good use of her hands for manual dexterity purposes. R. 350. She could rarely reach, pull, or grasp with either hand. *Id*. In an eight-hour workday, Plaintiff could sit or stand/walk for less than two hours respectively. R. 351. The ALJ ultimately afforded this opinion "little weight."[6] R. 25-26.

As previously indicated, Plaintiff submitted approximately 250 pages worth of new medical evidence to the ALJ after Dr. Hinchen wrote his report in early May 2016. The post-May 2016 evidence includes the following related to Plaintiff's physical conditions. The first set of records comes from True Care Medical Center. R. 736-96. During a visit on June 24, 2016, Plaintiff had normal range of motion of all extremities with tenderness in her low back; on

---

[6] The Court is unsure if "little weight" is more or less weight than "minimal weight" or even if it differs in any appreciable degree from "some weight." Indeed, unless "no weight" is given to an opinion, then any opinion would have "some weight."

8

October 19, 2016, she had reduced range of motion and tenderness in both her middle and low back; on November 17, 2016, Plaintiff again presented with limited range of motion and tenderness in the middle and low back. R. 740, 745, 762. Second, Ms. Cooper's opinion from January 2017. R. 715-20. Third, Dr. Alghafeer's June 2017 medical opinion and his treatment notes documenting six physical examinations from February 2016 through February 2017. R. 797-819. Earlier in her treatment with Dr. Alghafeer, Plaintiff presented with normal range of motion but with diffuse tenderness and 18/18 fibromyalgia tender points. R. 800-12 (February 4, 2016 to January 1, 2017). During the last visit on February 16, 2017, Plaintiff presented with 18/18 fibromyalgia tender points, decreased flexion in the neck and back, general muscle tenderness and progression of osteoarthritis in her DIP and PIP joints. R. 797-99. Fourth, treatment and progress notes from Integrated Pain Management, detailing eight visits from January 5, 2017 through June 23, 2017, including an updated CT scan from June 2017 revealing degeneration in the cervical spine. R. 820-42. These treatment notes document Plaintiff's reduced range of motion and extension of the cervical spine, tenderness in the cervical spine, lumbar spine and hip tenderness with pain but with equal and symmetric reflexes, largely normal gait, hand pain with tenderness and limited finger flexion, and the use of trigger point injections to treat Plaintiff's pain. *Id*. Fifth, Dr. Arif Saleem's April 26, 2016 treatment records noting some abnormalities in her right shoulder, but none that would explain all her symptoms. R. 853-54. Sixth, records from Plaintiff's October 13, 2016 visit with Dr. Timothy Petsche for her right shoulder pain, where Plaintiff exhibited diminished sensation in her index finger, abduction weakness, painful forward flexion and abduction with discomfort near the end range. R. 866-69. Dr. Petsche noted Plaintiff's "cervical spine motion appears quite limited secondary to previous cervical fusion" and agreed with a previous doctor that her symptoms were related to her cervical

9

spine. R. 868-69. Seventh, another updated CT scan from August 11, 2017, revealing "[m]oderate to severe bilateral neuroforaminal stenosis and moderate to severe narrowing of the central canal" of the lumbar spine (specifically L3-4 and L4-5), with an impression of multilevel osteoarthritis and disc disease of the lower lumbar spine. R. 895. Eighth, progress notes from Forever 25 Medical dating from February 14, 2017 through August 1, 2017. R. 896-938. Throughout the seven visits reflected in these notes, Plaintiff exhibited tenderness bilaterally in the hips and right shoulder, restricted range of motion in the right shoulder, and cervical facet and arm and hand tenderness bilaterally. R. 898, 899, 909, 911, 918, 925, 934. However, the ninth set of documents from Innovative Express detailing visits from December 8, 2016 through June 15, 2017 show Plaintiff presented for three visits where she exhibited largely normal physical findings except for neck tenderness. R. 939-47.

      For all disability claims filed before March 27, 2017, an ALJ must evaluate a claimant's treating physician opinion in two steps. First, the treating physician's opinion is entitled to "controlling weight" if it is (1) well-supported by medically acceptable clinical and laboratory diagnostic techniques and (2) is not inconsistent with substantial evidence in the record. 20 C.F.R. § 404.1527(c)(2). Second, if an ALJ finds a treating physician's opinion is not entitled to controlling weight, she may not simply disregard it, but must instead move to step two of the analysis and determine what weight to afford the opinion in light of the checklist factors in 20 C.F.R. § 404.1527(c)(2), including: (1) the nature of the examining relationship, (2) the length of the treating relationship, (3) whether the medical evidence supports the opinion, (4) whether the opinion is consistent with the record, (5) the physician's specialization, and (6) any other factors that relate to the opinion. This Court has explained its view on numerous occasions that the ALJ's failure to explicitly address these factors is error and that the ALJ must explain her

reasoning rather than simply state she has considered the checklist factors. *Nash v. Colvin*, No. 15 CV 50019, 2016 U.S. Dist. LEXIS 124616, at *15-16 (N.D. Ill. Sept. 14, 2016); *Duran v. Colvin*, No. 13 CV 50316, 2015 U.S. Dist. LEXIS 101352, at *23-33 (N.D. Ill. Aug. 4, 2015); *Edmonson v. Colvin*, No. 14 CV 50135, 2016 U.S. Dist. LEXIS 32019, at *15-24 (N.D. Ill. Mar. 14, 2016). Ultimately, an ALJ must provide "good reasons" for rejecting a treating source's opinion after considering all applicable factors. 20 C.F.R. § 1527(c)(2); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010).

As with ALJs in many other cases, the ALJ here skipped the first of these two steps and failed to explicitly consider all applicable 20 C.F.R. § 404.1527(c)(2) factors at the second step. Instead, the ALJ afforded Dr. Alghafeer's opinion "little weight" for two reasons related to the "consistency" and "supportability" factors: (1) the extreme limitations Dr. Alghafeer opined necessary were not supported by the record overall, including mild findings regarding tenderness and range of motion deficits; and (2) Plaintiff could engage in activities Dr. Alghafeer opined she could never engage in, such as bending, and pointed out that Plaintiff could sit which requires bending and could "sit . . . in a vehicle to go to and from Missouri for treatment and medications." R. 25-26.

Initially, there is no indication the ALJ considered all applicable 20 C.F.R. § 404.1527(c) factors when weighing Dr. Alghafeer's opinion as the regulations require. *Lambert v. Berryhill*, 896 F.3d 768, 775-76 (7th Cir. 2018). He did not mention or consider that Dr. Alghafeer specializes in rheumatology and therefore some of the pain disorders Plaintiff has.[7] The ALJ also neglected to discuss the nature of Dr. Alghafeer's treating relationship with Plaintiff: by the time

---

[7] Rheumatologists specialize in treating musculoskeletal diseases, including joint paint, inflammation, osteoarthritis, and rheumatoid arthritis. *See, e.g.*, *Rheumatology and Rheumatic Diseases*, WEB MD (May 30, 2019), https://www.webmd.com/rheumatoid-arthritis/an-overview-of-rheumatic-diseases.

11

Dr. Alghafeer wrote his opinion, he had regularly treated Plaintiff for approximately one year and nine months. During that time, he had seen Plaintiff approximately ten times, prescribed various medications, and administered injections to treat her pain symptoms. R. 469-74, 570-71, 885-87, 797-809. The regulations require ALJs to address the checklist factors because long-time treating physicians like Dr. Alghafeer likely have more insight into the longitudinal aspect of a patient's treatment than a onetime, non-examining state agency physician would. *See* 20 C.F.R. § 404.1527(c) (more weight generally given to opinions from specialists and to examining and treating relationships); *Mueser v. Colvin*, 838 F.3d 905, 912 (7th Cir. 2016); *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013); *Campbell*, 627 F.3d at 308. Therefore, these factors likely weigh in favor of assigning more weight to Dr. Alghafeer's opinion, yet the ALJ neglected to discuss them and so there is no way for the Court to know whether or to what degree the ALJ considered them.

The Commissioner contends that the ALJ's two reasons for discounting Dr. Alghafeer's opinions are minimal, but sufficient. Dkt. 22 at 5-8. First, the ALJ found that the extreme limitations Dr. Alghafeer opined necessary were not supported by the overall record, including tenderness and range of motion deficits. R. 25-26. However, this rationale conflicts with his primary rationale for assigning only some weight to the state agency opinions and highlights why the ALJ should have submitted the post-May 2016 evidence to a medical expert. The ALJ only afforded the state agency opinions "some weight" because they never saw the post-May 2016 medical records which, according to the ALJ, "show[] continued progression of degenerative changes in the cervical and lumbar spine as well as in the hands" warranting "a further reduction [from the light level] to the sedentary level . . . ." R. 25. The ALJ also cited Dr. Alghafeer's February 2017 treatment notes to explain that they "demonstrated osteoarthritic changes of the

12

fingers with diffuse tenderness on physical examination" for the first time in the record. R. 23 (citing R. 798).

This logic is contradictory and cannot support the ALJ's weight determination. Using the ALJ's reasoning that Plaintiff's impairments had worsened since the state agency physicians had reviewed the record and evinced degenerative changes in Plaintiff's hands for the first time, Dr. Alghafeer's opinion would be due *more* weight because he wrote the most recent medical opinion and personally documented these deteriorative changes. Further, although the ALJ explicitly highlighted the issue that the recent medical records show more degenerative change over time than the state agency doctors were aware of, and seemingly agreed with Dr. Alghafeer in that Plaintiff's conditions seemed to deteriorate over time as per the post-May 2016 evidence, he discredited Dr. Alghafeer's opinion for being inconsistent with the entire record which necessarily includes post-May 2016 evidence. Perhaps the ALJ meant to convey that Dr. Alghafeer's opinion is inconsistent with the pre-May 2016 records, but he does not articulate this reasoning. Regardless, that conclusion would be consistent with Dr. Alghafeer's later and more informed opinion calling for more functional limitations based on the progression of Plaintiff's impairments since the state agency experts had reviewed the available record. In other words, the ALJ analyzed the post-May 2016 records and recognized that they reasonably could have changed the opinions of the state agency consultants, yet he did not seek out a doctor to opine on the medical import of this new evidence showing increased degenerative changes before rejecting the opinion of the only doctor to review any of that new evidence, Dr. Alghafeer. R. 23, 25. Instead, he expressly relied on admittedly outdated and under-informed medical opinions from the state agency physicians.

The Commissioner contends that an ALJ is not necessarily precluded from relying on a state agency expert who issues an opinion before all medical evidence is submitted, and that the ALJ is required to independently review objective medical evidence. Dkt. 22 at 9-12 (citing *Schmidt v. Astrue,* 496 F.3d 833, 845 (7th Cir. 2007)). However, ALJ's may not rely on outdated state agency medical opinions "if later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion." *Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018). As discussed above, the ALJ explicitly acknowledged that the newest treatment records (including Dr. Alghafeer's notes and two updated CT scans of the lumbar and cervical spine) show increased degeneration in Plaintiff's cervical and lumbar spine and evinced degeneration for the first time in Plaintiff's hands but that the state agency experts did not have an opportunity to review that evidence and discredited their opinions on that basis. *See Michelle M. v. Saul*, No. 18 CV 50003, 2019 U.S. Dist. LEXIS 210144, at *18-20 (N.D. Ill. Dec. 5, 2019) (remanding in part because ALJ independently evaluated 200 pages of new medical evidence against outdated opinions from state agency physicians and provided "mixed signals" as to whether the new evidence showed serious progression of claimant's impairments over time). Therefore, the ALJ believed the degenerative changes revealed by the post-May 2016 evidence "could" have reasonably changed the state agency doctors' opinions, so much so that he discredited their opinions that Plaintiff could perform "light" work and instead reduced Plaintiff to "sedentary" work, yet he also discounted the opinion of the only doctor to review any of that new evidence, Dr. Alghafeer. When the ALJ implicitly decided that these new records would have changed the state agency doctors' opinions, and because Plaintiff points to evidence within the post-May 2016 evidence that could reasonably support a finding of greater limitations as summarized above, he should have sought the advice of a medical expert to review the new

14

treatment records.[8] Given the substantial amount of new medical records the state agency physicians never considered (approximately 250 pages), that those records revealed progressive changes significant enough to cause the ALJ to discredit all opinions on record and reduce Plaintiff from light to sedentary work (including first-time evidence of osteoarthritic changes to the hands), and that the ALJ seemingly interpreted that evidence in a manner consistent with Dr. Alghafeer's opinion in that Plaintiff was more functionally limited than the state agency experts opined, the Court is persuaded that the ALJ erred by relying on outdated medical opinions and failing to submit the new evidence to another medical expert to opine on the extent of these changes and instead making that determination himself. *See Akin v. Berryhill*, 887 F.3d 314, 318 (7th Cir. 2018) (citing *Green v. Apfel*, 204 F.3d 780, 782 (7th Cir. 2000)); *Ronald W. v. Saul*, No. 17 CV 8536, 2019 U.S. Dist. LEXIS 140162, at *26-29 (N.D. Ill. Aug. 19, 2019) (ALJ erred by determining significance of new medical evidence himself despite agreeing that new evidence warranted greater limitations than outdated state agency opinions suggested necessary).

To the extent the ALJ meant to suggest that Dr. Alghafeer's opinion is inconsistent with his own treatment notes and the other post-May 2016 evidence, the ALJ does not provide any examples or otherwise explain this reasoning aside from mentioning an inconsistency between Dr. Alghafeer's opinion and the mild tenderness and range of motion findings throughout the record generally. But as Plaintiff points out in her brief, Dr. Alghafeer's treatment notes that the state agency physicians never evaluated reflect tender points, decreased flexion in the neck and back, muscle tenderness and progression of osteoarthritis in her DIP and PIP joints over the

---

[8] This is not a case where the claimant failed to contradict the state agency reports with new evidence entirely or otherwise failed to explain how the new evidence would have changed the doctors' opinions. *See, e.g.*, *Keys v. Berryhill*, 679 F. App'x 477, 481 (7th Cir. 2017) (affirming ALJ's reliance on uncontradicted state agency opinions). Here, the ALJ agreed that the new evidence would have likely changed the doctors' opinions, and Plaintiff's more recent treatment notes and treating physician opinion contradict the state agency opinions.

15

length of the treating relationship. R. 469, 471, 798, 807, 810. Additionally, the other post-May 2016 evidence is largely comprised of notes from doctor visits where Plaintiff presented with tenderness and restricted range of motion in her hands and neck, again suggesting that Plaintiff's condition worsened over time despite the older medical records evincing these findings to a more limited degree. R. 740, 745, 762, 797-99, 866-69, 898, 899, 909, 911, 918, 925, 934. Without more explanation or an updated expert's opinion, the ALJ's suggestion that Dr. Alghafeer's post-May 2016 treatment notes contradict his opinion, or the ALJ's opinion that the post-May 2016 notes reflect only "mild" changes, is unsupported.

The ALJ's second rationale for assigning little weight to Dr. Alghafeer's opinion is also unsupported by the record. Dr. Alghafeer opined that Plaintiff could sit continuously for thirty minutes but could never bend. The ALJ reasoned that this aspect of Dr. Alghafeer's opinion was inconsistent with the fact that Plaintiff could sit at all because sitting requires bending. R. 26. Using the ALJ's logic, a person with serious lower back pain who could never bend from the standing position could never sit down for any reason. Setting aside the Court's skepticism (perhaps bending from the standing position differs from bending required to sit), no doctor opined on the relationship between bending and sitting. *See Jenkins v. Colvin*, 1:12-cv-1519-WTL-DML, 2014 U.S. Dist. LEXIS 29321, at *18 n. 4 (S.D. Ind. Mar. 6, 2014) (noting disbelief with ALJ's suggestion that "bending" and "twisting" are synonymous with "sitting" and suggesting the ALJ recontact the opining medical expert for clarification on remand). Without a medical opinion to support it, the ALJ was not permitted to rely on this assumption to justify his weight determination.

Similarly, the ALJ cited the fact that Plaintiff had to sit in a car as her husband drove her from Illinois to Missouri for medications and treatment as an example of Plaintiff's ability to

16

bend and sit to justify his weighing of Dr. Alghafeer's opinion. R. 26, 66. But this example fails for the same reason. Again, no doctor opined as to the degree of bending required to sit down, suggested bending to sit and bending from the standing position are mutually exclusive functions, or opined that "bending" and "sitting" are synonymous terms. To the extent the ALJ meant to imply that Plaintiff's ability to sit for more than thirty minutes conflicts with Dr. Alghafeer's opinion that Plaintiff could only sit for approximately thirty minutes at a time, Plaintiff never testified that she sat for the four-and-a-half hours of driving without stopping for breaks or changing positions. And the ALJ never asked Plaintiff whether she sat for the entire trip or if her husband had to make brief stops to allow her to change positions during the trip, a common occurrence during lengthy drives. Indeed, Plaintiff mentioned these trips off-handedly once in her testimony and the ALJ never followed up to ask any clarifying questions about these trips. R. 65-66. Therefore, though it is possible these trips are inconsistent with Dr. Alghafeer's opinion that Plaintiff can only sit for approximately thirty minutes at a time, this conclusion is at best unclear on this record absent further clarification. Because the ALJ failed to apply the treating physician rule, explicitly consider all 20 C.F.R. § 404.1527(c)(2) factors, and otherwise provide valid justifications supported by the record to discount Dr. Alghafeer's opinion, remand is warranted to allow the ALJ to appropriately weigh it.

      Finally, the Court recognizes another error warranting remand not squarely addressed by the parties but implicated by Plaintiff's arguments regarding the ALJ's failure to submit the new medical records to an expert and one all too common in social security appeals: doctor playing. As summarized above, the post-May 2016 evidence contains two new, updated CT scans: the first from June 23, 2017 revealing progressive erosive changes in Plaintiff's cervical spine; the second from August 11, 2017 revealing further degeneration of Plaintiff's lumbar spine. R. 841-

42, 895. No expert (including Dr. Alghafeer) reviewed or opined on the effect of these erosive changes revealed by the CT scans, yet the ALJ explicitly cited to these scans and reasoned that their findings were "generally mild" before concluding that Plaintiff could perform sedentary work. R. 23, 25. Without the benefit of a doctor's opinion on the subject, the ALJ independently interpreted the meaning of the CT scans, which he is not permitted to do. After all, "the [CT scan] results may corroborate [Plaintiff's] complaints, or they may lend support to the ALJ's original interpretation, but either way the ALJ was not qualified to make his own determination without the benefit of a medical opinion." *Akin*, 887 F.3d at 317-18; *see also Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016); *Moon v. Colvin,* 763 F.3d 718, 722 (7th Cir.2014). This error could have been avoided had the ALJ called a medical expert at Plaintiff's disability hearing or sought an updated medical opinion. *Akin*., 887 F.3d at 318 (citing *Green v. Apfel*, 204 F.3d 780, 782 (7th Cir. 2000)). Therefore, remand is also warranted to allow a medical expert to opine on the effect of the osteoarthritic changes revealed by the updated CT scans.

      The ALJ's errors in failing to submit the post-May 2016 evidence to another expert for review, and the resultant errors in weighing Dr. Alghafeer's opinion and playing doctor, are not harmless because the Court is not convinced the ALJ would reach the same result on remand. *See Lambert*, 896 F.3d at 776. On remand, the ALJ should seek a medical expert to opine on the import of the post-May 2016 medical evidence and explicitly and appropriately address all applicable 20 C.F.R. § 404.1527(c)(2) factors when weighing Dr. Alghafeer's opinion to ensure any subsequent reviewer that he has considered them. Plaintiff raises many other arguments in her brief, but because remand is warranted regardless, the Court takes no position on those remaining arguments.

## IV. CONCLUSION

For those reasons, Plaintiff's motion for summary judgment is granted, the Commissioner's motion for summary judgment is denied, and the case is remanded for proceedings consistent with this opinion.

Date: 7/16/2020         By: _____
                        Iain D. Johnston
                        United States Magistrate Judge